IN RE: J.D.W.
No. COA07-1010
North Carolina Court of Appeals
Filed January 15, 2008
This case not for publication
Jayne B. Norwood, for Petitioner-Appellee Nash County Department of Social Services.
Terry F. Rose, for Respondent-Appellant.
Philip Lane, for Respondent-Appellee.
Carolyn O'Garro-Moore, for Guardian ad Litem.
ARROWOOD, Judge.
Respondent Sherry W.,[1] mother of the minor child J.D.W., appeals from an order terminating her parental rights. We affirm.
The record reflects that J.D.W. was born in 1993 and lived with Respondent in Edgecombe County, North Carolina. When the child was two or three years old, he was removed from Respondent's home by the Edgecombe County Department of Social Services due to Respondent's problems with substance abuse. After a period in foster care, J.D.W. was placed with his father.
On 29 December 2005, the Nash County Department of Social Services (DSS) obtained nonsecure custody of J.D.W. and filed ajuvenile neglect petition pursuant to N.C. Gen. Stat. § 7B-402 (2005). The petition alleged that the child had been left by his father "in the care of a woman whose own child has been removed from the home due to the women's mental instability[,]" after DSS had notified the father that the woman was subject to episodes of mania, depression, and schizophrenia, and was non-compliant with her medication. The petition further alleged that J.D.W. had stayed briefly with Respondent but was sent back to his father after an "altercation[.]" It noted the previous removal of Respondent's other children from her home by Edgecombe County DSS.
The district court adjudicated J.D.W. a neglected juvenile in an order signed 14 March 2006. Respondent stipulated to facts consistent with the allegations set forth by DSS's petition, including the finding that "[i]n early December, J.D.W. left his father's home to live with his mother. However, she did not allow him to stay in her home after she and he had words on December 26, 2005[, and] sent J.D.W. back to the home of his father[.]" The court concluded that J.D.W. had been denied "proper care and supervision from his parents and . . . lived in an environment injurious to his welfare." It placed J.D.W. in the legal and physical custody of DSS and ordered Respondent to enter into a case plan with DSS if she wished to be reunified with the child.
Respondent failed to attend a review hearing held on 1 June 2006. The court found that she "did visit with J.D.W. on two occasions, but has made no progress in attending and completing parenting classes and she has not addressed her substance abuse." The court noted that the child was living in a Level III group home in Greenville, North Carolina, his fourth placement since entering DSS custody. Due to the parents' lack of effort toward completing their case plans, the court relieved DSS of further efforts toward reunification and limited each parent to one visit with the child per month until they demonstrated "efforts toward [their] court ordered tasks."
Respondent did not attend J.D.W.'s permanency planning hearing on 6 July 2006. In an order signed on 3 August 2006, the district court established a permanent plan for J.D.W. of guardianship with a court approved caretaker and a concurrent plan of adoption. It found that Respondent had "not complied with the terms" of her case plan, "ha[d] not contacted [J.D.W.']s social worker since March 16, 2006, and has only had contact with [J.D.W.] two or three times since . . . December 29, 2005." Following a review hearing on 26 October 2006, which Respondent did not attend, the court approved a permanent placement plan of adoption on 1 December 2006. The court found that Respondent had failed to keep a scheduled appointment with J.D.W.'s social worker on 29 August 2006, and disregarded the social worker's subsequent request on 2 October 2006 that she comply with her case plan.
DSS filed motion to terminate Respondent's parental rights on 22 December 2006, on the grounds that she had (1) neglected J.D.W., (2) willfully left the child in foster care for more than twelve months without reasonable progress toward correcting the conditions which led to his placement outside the home, and (3) willfully abandoned the child for at least six months immediately prior to the filing of the motion. See N.C. Gen. Stat. § 7B-1111(a)(1), (2), (7) (2005). Respondent attended a subsequent review hearing on 25 January 2007.
The District Court held a hearing on DSS's motion on 19 April 2007, and signed its termination order on 14 June 2007. Based on the evidence adduced by the parties, the court concluded that Respondent had neglected and abandoned J.D.W., and had willfully left him in a placement outside the home without showing reasonable progress to correct the conditions which led to his removal. The court further found that termination of Respondent's parental rights was in the best interest of the child.
On appeal, Respondent first claims that the trial court erred by failing to enter the adjudicatory order within thirty days of the hearing, as required by N.C. Gen. Stat. § 7B-1109(e) (2005). Noting that J.W. is at a "critical age of [his] life" as a teenaged boy, Respondent contends that any delay beyond the statutory period was harmful to their bond as mother and son. She further argues that the court's violation of N.C. Gen. Stat. § 7B-1109 (2005) postponed her access to an appeal and "hamper[ed] her ability to reestablish a relationship with her child."
Section 7B-1109(e) requires the trial court to enter its order adjudicating the existence or non-existence of grounds for termination under N.C. Gen. Stat. § 7B-1111 (2005) "no later than 30 days following the completion of the termination of parental rights hearing." Although the issue is not raised by Respondent, we further note that the court must likewise enter a disposition "[a]fter an adjudication that one or more grounds for terminating a parent's rights exist" within thirty days of the termination hearing. N.C. Gen. Stat. § 7B-1110(a) (2005). However, this Court has consistently held that the untimely entry of a termination order will not be grounds for reversal, absent a showing of prejudice by the appellant. E.g., In re C.J.B. & M.G.B., 171 N.C. App. 132, 134, 614 S.E.2d 368, 369 (2005) (citations omitted).
The trial court held the termination hearing on 19 April 2007, and signed its order on 14 June 2007, twenty-six days beyond the statutory deadline. In view of Respondent's lack of effort toward developing a relationship with J.D.W., including her failure to visit him in the five months that preceded the hearing, we find no prejudice to her or the child arising from this brief delay. See In re J.B., 172 N.C. App. 1, 26, 616 S.E.2d 264, 279-80 (2005) (finding no prejudice from a three-month delay in entry of the termination order); In re D.R., 172 N.C. App. 300, 307, 616 S.E.2d 300, 306 (2005) (no prejudicial error where termination order was entered sixty-nine days after hearing); In re K.D.L., 176 N.C. App. 261, 267, 627 S.E.2d 221, 224 (2006) (no prejudicial error where termination order was entered fifty days after hearing); In re A.D.L., J.S.L., C.L.L., 169 N.C. App. 701, 705, 612 S.E.2d 639, 642-43 (no prejudicial error where termination order was filed forty-six days after hearing), disc. review denied, 359 N.C. 852, 619 S.E.2d 402 (2005); In re J.L.K., 165 N.C. App. 311, 314, 598 S.E.2d 387, 390 (2004) (no prejudicial error where termination order was entered eighty-nine days after date of hearing). We hold that the court's error was harmless.
Respondent next challenges the trial court's adjudication of grounds for termination based on neglect under G.S. § 7B-1111(a)(1). She asserts that the evidence did not support the court's finding that she attended only three visits with J.D.W. since he was removed from his father's home in 2005. She further contends that the court's findings of fact did not support its conclusions that (1) she had "neglected and abandoned the child within the meaning of N.C.G.S. § 7B-101[,]" or that (2) there were "clear, cogent and convincing facts to terminate [her] parental rights", pursuant to N.C.G.S. § 7B-1111."
On review of an order terminating parental rights, we must determine (1) whether the District Court's findings of fact are supported by clear, cogent and convincing evidence, and (2) whether the court's findings of fact support its conclusion of law that one or more statutory grounds for termination exist. In re Huff, 140 N.C. App. 288, 291, 536 S.E.2d 838, 840 (2000). As trier of fact in juvenile proceedings, the District Court is empowered to "weigh and consider all competent evidence, and pass upon the credibility of the witnesses, the weight to be given their testimony and the reasonable inferences to be drawn therefrom." In re Whisnant, 71 N.C. App. 439, 441, 322 S.E.2d 434, 435 (1984). Accordingly, this Court is bound by findings of the trial court which are supported by sufficient competent evidence, "even where some evidence supports contrary findings." In re Helms, 127 N.C. App. 505, 511,491 S.E.2d 672, 676 (1997) (citing In re Montgomery, 311 N.C. 101, 111, 316 S.E.2d 246, 253 (1984)). Uncontested findings are "presumed to be correct and supported by evidence[,]" and are likewise binding on appeal. In re Moore, 306 N.C. 394, 404, 293 S.E.2d 127, 133 (1982).
Respondent challenges the trial court's finding that she visited with J.D.W. just three times since DSS took custody of the child in December of 2005. DSS social worker Marcia Mangum and Respondent offered testimony regarding Respondent's visitation with J.D.W. After noting that she had been J.D.W.'s foster care social worker throughout these proceedings, Mangum described each parent's contact with the child. She was first asked about the father's visitations and averred that he had visited the child "no more than five times." Mangum was then asked about Respondent's visitation with J.D.W. and responded as follows:
Q: How many times has [respondent] visited with J[.W.]?
A. She attended, um, I know she has attended one, maybe two, review teams with us and one of those meetings was in Oxford when J[D.W.] was there. She has made, I believe, two visits since he's been in Greenville. I would say no more than five, either.
. . . .
Q: When you were providing visits with J[D.W.] and [respondent], how was that set up? Did she call and ask to visit or did you contact her and ask her if she wanted one, how did that work?
A: Um, on one occasion, I transported her to a visit in Oxford, when we did a . . . treatment team meeting there and I transported her and her oldest son . . . . The other two times she's visited with J[D.W.], I gave her information to allow her to schedule that with the group home and group home staff supervised that in Greenville. . . .
(Emphasis added). Mangum thus testified that Respondent attended two visits with J.D.W. at his group home and also visited with the child during one of the two team meetings she attended _ a total of three visits. However, Mangum also appeared to draw an equivalency between the parents' lack of visitation, stating that Respondent, like the father, had paid "no more than five" visits to her son.
On cross examination, Mangum was again asked how often Respondent had visited the child and replied, "[L]ike . . . I stated earlier, no more than about five times since I've been involved." She later repeated this response, as follows:
Q: What if any, contact did you get from [respondent] requesting visits?
A: She didn't contact me to say that she needed my assistance, um, to my knowledge she visited on a couple of occasions, maybe two, and I did talk with group home staff that said . . . she arranged it and set it up, she came and it was appropriate.
Q: And in the last year, you're saying that she's had about five visits?
A: I would save no more than five, yes.
(Emphasis added). Respondent testified that she visited J.D.W. four times, most recently before Thanksgiving in November of 2006. We believe that Mangum's testimony was sufficient to support the court's finding that Respondent visited J.D.W. only three times since he was removed from his father's home in December of 2005. After testifying that the father had "no more than five" visits with the child during this period, Mangum twice detailed the three visits taken by Respondent. It appears that Mangum's additional description of "no more than five" visits by Respondent reflected her belief that Respondent had performed no better than the father in this regard.
While we agree with appellees that the distinction between three visits and "no more than five" visits over a sixteen-month period is not dispositive to an adjudication under G.S. § 7B-1111(a)(1), we cannot say the trial court erred by basing its finding upon the more specific and precise portions of Mangum's testimony on this issue. Cf. State v. McNeil, 359 N.C. 800, 804, 617 S.E.2d 271, 274 (2005) ("Evidentiary contradictions and discrepancies" are to be resolved by the fact-finder.) (internal quotation marks omitted). Moreover, the court was free to credit Mangum's account over Respondent's claim of four visits with the child. See In re Oghenekevebe, 123 N.C. App. 434, 439, 473 S.E.2d 393, 397-98 (1996).
Having resolved Respondent's lone exception to the District Court's findings of fact, we must determine whether its findings support its adjudication of grounds for termination under G.S. § 7B-1111(a)(1). Section 7B-1111(a)(1) allows the court to terminate parental rights if the parent has "neglected the juvenile."
The Juvenile Code defines a neglected juvenile, inter alia, as one "who does not receive proper care, supervision, or discipline from [his] parent . . . or who has been abandoned[.]" N.C. Gen. Stat. § 7B-101(15) (2005). To establish grounds for termination, the evidence must show actionable neglect at the time of the adjudication hearing. In re Beasley, 147 N.C. App. 399, 404, 555 S.E.2d 643, 646 (2001); see also In re Ballard, 311 N.C. 708, 715, 319 S.E.2d 227, 232 (1984) ("The determinative factors must be the best interests of the child and the fitness of the parent to care for the child at the time of the termination proceeding."). Where a child has not been in the parent's custody for a significant period prior to the hearing, "a trial court may find that grounds for termination exist upon a showing of a history of neglect by the parent and the probability of a repetition of neglect" if the child were returned to her care. In re L.O.K., T.L.W. & T.L.W., 174 N.C. App. 426, 435, 621 S.E.2d 236, 242 (2005) (internal quotation marks omitted).
In support of its conclusion that Respondent had neglected J.D.W., the trial court found as follows:
5. That the child was placed in the custody of [DSS] on December 29, 2005 pursuant to a Non-Secure Custody Order . . . .
6. That the child was adjudicated as a neglected juvenile on February 6, 2006 in that [he] did not receive proper care and supervision from his parents and in that he lived in an environment injurious to his welfare. At the time of the adjudication J[D.W.] was in the custody of his father pursuant to an Order entered in Edgecombe County Juvenile Court.
. . . .
11. Ms. Mangum made efforts to enter into a case plan with [respondent] to address the issues that she needed to address if interested in regaining custody of her son. [Respondent] did not meet with Ms. Mangum until February 2006 to sign the case plan.[Respondent] agreed to obtain a substance abuse assessment and comply with the recommendations of the assessment, attend Parenting Plus classes and visit regularly with J[D.W.] to develop a relationship with her son. The case plan was written to address the issues that led to [the child] being removed from her custody in Edgecombe County.
12. [Respondent] has only recently completed Parenting Plus classes and offered no explanation for the delay in completing these classes. She stated she had a Substance Abuse Assessment, but has not provided [DSS] with verification that she has done so. [Respondent] was offered transportation by Ms. Mangum to assist in visiting J[.W.], . . . but she has only visited three times since he was placed in foster care. [Respondent] states she does not visit with J[D.W.] because she has other children she is dealing with and he is placed too far away even though the juvenile is placed in Greenville, NC which is easily accessible to persons who reside in Rocky Mount.
13. [Respondent] has advised Ms. Mangum that she loves her son and wants to take care of him, but [he] has no respect for her because she lost her children to the system. [Respondent] is currently residing with her fiancé[] and her 18-year-old son in a residence that she and her fiancé[] purchased in July 2006. . . .
14. Custody of J[D.W.] was removed from [respondent] approximately 10 years ago by the Edgecombe County Department of Social Services due to her substance abuse. J[D.W.] was placed with his father as he "stepped up to the plate" to do the right thing. [Respondent] admitted she was aware that [J.D.W.'s] placement with his father had become unstable in 2005. . . .
15. [Respondent] did not pursue placement of J[D.W.] with her at the time he was placed in foster care in December 2005 because she was "sitting back to see what his father would do[." Respondent] did not believe it was in her best interest to work towards reunification at that time. She does not feel responsible for J[D.W.] being placed in foster care instead of with family because he has a lot of issues with respect. Prior to J[D.W.] being placed in foster care in 2005, he ran from his father's home to his mother's home and she ["]jacked him up" . . . because he was disrespectful to her and her fiancé[] and she refused to allow him to be in her home and be disrespectful.
16. [Respondent] did not initially comply with the case plan, because she hoped J[D.W.]'s father would "step up to the plate" and do the right thing. She admits she has not visited with J[D.W.] since November 2006, but has talked to him on the phone. She is unable to visit because he is placed in Greenville, but offered no explanation as to why she did not take advantage of the offer by [Mangum] to provide transportation to visits. [Respondent] has not purchased birthday or Christmas gifts for J[D.W.] because she is paying child support for his well-being.
The court concluded, based on these findings, that Respondent had "neglected and abandoned the child[.]" Although a parent's willful abandonment of a child is a separate ground for termination under G.S. § 7B-1111(a)(7), we address only whether Respondent's conduct toward J.W. amounted to neglect for purposes of G.S. § 7B-1111(a)(1).
We hold that the facts found by the court established Respondent's ongoing neglect of J.D.W. at the time of the termination hearing. Although Respondent was the non-custodial parent at the time DSS took custody of the child on 29 December 2005, she took no action to prevent the child's placement in foster care, resulting in his adjudication as neglected by both parents in March of 2006. Respondent delayed signing a case plan with DSS and then delayed acting on the plan until the following year, purportedly while waiting to see if the father would regain custody. Respondent never provided verification of her substance abuse assessment or treatment, despite acknowledging that she originally lost custody of J.D.W. in Edgecombe County due to "[d]rugs."
Following the 9 February 2006 hearing that resulted in the adjudication of neglect, Respondent did not attend another hearing in this cause until 25 January 2007, after DSS moved to terminate her parental rights. Moreover, although Respondent did complete parenting classes, she did not comply with this condition of her case plan until after the motion for termination was filed. See In re B.S.D.S., 163 N.C. App. 540, 545-46, 594 S.E.2d 89, 93 (2004).
Respondent's lack of consistent contact with J.D.W. was further evidence of neglect. We have recognized that, "on the question of neglect, the trial judge may consider, in addition, a parent's complete failure to provide the personal contact, love, and affection that inheres in the parental relationship." In re Apa, 59 N.C. App. 322, 324, 296 S.E.2d 811, 813 (1982); see also Pratt v. Bishop, 257 N.C. 486, 501, 126 S.E.2d 597, 608 (1962) ("[I]f a parent withholds his presence, his love, his care, the opportunity to display filial affection, and wilfully neglects to lend support and maintenance, such parent relinquishes all parental claims and abandons the child."). The child's need of parental contact, love and support was particularly apparent in this case, given his age, behavioral problems, and placement in a series of group homes since coming into DSS custody. Despite Mangum's emphasis on the importance to J.D.W. of regular visitation, as well as Respondent's need to build a relationship with her son after more than ten years apart, Respondent paid only a few visits in a sixteen-month period and had not seen the child for five months at the time of the hearing. In addition to Mangum's offer of transportation to Respondent, we note Respondent's testimony that she owned a car and had a driver's license but had never driven herself to Greenville to visit J.D.W. at his group home. When asked if she was capable of driving Greenville, Respondent replied, "If I had to." Moreover, although Respondent had spoken to J.D.W. by phone during the week prior to the termination hearing, the Guardian ad Litem testified that when he spoke to the child two weeks before the hearing, he "couldn't recall the last time he'd talked to [respondent]."
When asked more generally about her telephone contact with the child, Respondent testified:
I talked to J[D.W.] approximately, I mean he keeps in contact with his brother. There may be times when he calls that he doesn't talk to me but he tells his brother to tell, mom, I said hello and I'll tell him hi and they'll talk. He communicates with his brother quite often.
As noted in the court's findings, Respondent explained that she did not send a gift or card to J.D.W. at Christmas, because she felt that her child support payments were already "going to the well being of my child." We conclude that these findings more than established Respondent's ongoing neglect of the child for purposes of G.S. § 7B-1111(a)(1). Having upheld the court adjudication under G.S. § 7B-1111(a)(1), we need not address the additional ground or grounds for termination included in the order. In re B.S.D.S., 163 N.C. App. at 546, 594 S.E.2d at 93-94.
Respondent next claims that the trial court abused its discretion by terminating her parental rights. Once the court adjudicates the existence of grounds for termination under G.S. § 7B-1111(a), it must "determine whether terminating the parent's rights is in the juvenile's best interest." G.S. § 7B-1110(a). In assessing the interests of the child, the court is required to consider several factors, including: (1) the child's age; (2) the likelihood of his adoption; (3) whether termination will help effectuate the child's permanent placement plan; (4) the child's bond with the parent; (5) the child's relationship with the proposed adoptive parent or other permanent placement; and (6) any other relevant consideration. G.S. § 7B-1110(a). The decision to terminate parental rights at the dispositional stage of the proceedings is discretionary and will be reversed only if it is "manifestly unsupported by reason." Clark v. Clark, 301 N.C. 123, 129, 271 S.E.2d 58, 63 (1980).
In addition to its findings regarding Respondent's lack of involvement with J.D.W., the court found that the child's father had visited him five times since December of 2005, but had otherwise made no progress on his case plan. J.D.W.'s father was incarcerated in September 2006 and, since his release from prison in February of 2007, the father had not contacted DSS or his attorney regarding his son and did not attend the termination hearing. The court made the following additional findings in support of its conclusion that terminating Respondent's parental rights was in the best interest of the child:
17. Mr. Tim Craig, the [G]uardian ad [L]item, has been involved with J[D.W.] for over a year and has explained the termination of parental rights process to [him]. J[D.W.] has stated that he currently has no desire to be adopted and that he has parents. . . . Mr. Craig believes J[D.W]. is more stable now than at any time in his life and deserves a permanent home that can offer him continued stability. J[D.W.] advised Mr. Craig he had spoken with his father by phone several weeks ago, but could not recall the last time he had had any contact by his mother.
. . . .
21. J[D.W.] is now thirteen years old and would have to consent to his adoption. He currently expresses no desire to be adopted, but it is the hope of [DSS] that a family will commit to J[D.W.] and he will be willing to consider them. He is currently having respite visitation with a family who are considering adoption and J[D.W.] enjoys his visits. He is in need of a stable loving permanent home. No known barriers to adoption exist.
The court heard testimony from Mangum that termination would allow DSS "to be able to move forward, to try to find a family for [him]" through the state-wide adoption exchange system. Mangum also believed that termination would bring closure to J.D.W.'s wish to be reunited with father, as well as the child's identification with his father's criminal activity. Mangum noted DSS's previous success in adopting children older than thirteen years of age but did know the statistical likelihood of success and conceded that "it can go either way[.]" Even if J.D.W. could not be adopted, however, Mangum averred that termination would allow DSS to "at least keep him connected with people who will be more committed to him . . . than his parents have been." Craig also testified that adoption would be in J.D.W.'s best interests. He echoed Mangum's belief that J.D.W. "idealized his father to a degree[,]" and that his continued hope of reunification with his father made him "less likely to commit to [his] treatment program [at] the group home[.]" Although J.D.W. reported having no contact with his mother, Craig opined that continued contact from the father may have a "negative impact on him."
While the court did not enter separate findings corresponding to each of the factors enumerated in G.S. § 7B-1110(a), we believe its findings were sufficient to reflects its consideration of the relevant factors in determining the best interest of J.D.W. Respondent makes no showing that the court's decision to terminate her parental rights was "so arbitrary that it could not have been the result of a reasoned decision." White v. White, 312 N.C. 770, 777, 324 S.E.2d 829, 833 (1985). Accordingly, we find no abuse of the court's discretion.
In her brief to this Court, Respondent abandons her remaining assignment of error.
Affirmed.
Judges MCGEE and HUNTER concurs.
Report per Rule 30(e).
NOTES
[1] We note that Respondent is identified as Sherry L. in the majority of the materials of record and identified herself as Sherry L. at the termination hearing.